112  817
114  187

(36 South. 743.)

No. 14,814.

WARNER v. TALBOT et al.

(Dec. 14, 1903.)

**ASSAULT AND BATTERY—ACTION FOR DAMAGES —EVIDENCE—APPEAL—INSTRUCTIONS.**

1. In a civil action to recover actual damages for abuse and ill treatment inflicted in an effort to extort information from one suspected of having committed a crime, evidence as to the facts connected with such supposed crime, said to have been committed five days prior to the abuse and ill treatment complained of, is inadmissible either by way of justification or in mitigation of the damages claimed.

2. In a civil case, where there is no well-founded complaint of the exclusion of evidence, it becomes immaterial, on the appeal, whether the charge of the trial judge was right or wrong, since it is the duty and privilege of this court to apply the law, according to its understanding thereof, and regardless of what the trial judge may have charged, to the facts as disclosed by the record.

3. Where a number of citizens, without warrant of law, take into the woods a young man whom they suspect of having committed the crime of arson, and who is, at the time, in attendance upon the grand jury, and there abuse and ill treat him for a number of hours, and place a rope around his neck and threaten to hang, and make a demonstration of hanging, him, all with a view of extorting from him a confession of the crime or an accusation against some other person, a verdict of $500 as damages for mental anguish, terror, and distress is insufficient, even though nothing be claimed on account of damage to reputation, and nothing be proven in the way of pecuniary loss, and the amount allowed will be increased.

(Syllabus by the Court.)

Appeal from Fifth Judicial District Court, Parish of Winn; Marion Franklin Machen, Judge.

Action by Peter Warner against B. H. Talbot and others. Judgment for plaintiff for $500, and he appeals. Reversed as to certain defendants, and amended by increasing the amount thereof as to certain other defendants, and affirmed.

Hudson, Potts & Bernstein and Kidd & Wallace, for appellant. Price & Roberts, Grisham & Mathews, Clayton & Hawthorn, and W. R. Jones, for appellees.

MONROE, J. Plaintiff alleges that he recently resided, and was engaged in the livery stable business, at Dodson, in the parish of Winn; that the business was prosperous, and that he conducted himself in an orderly and peaceable manner; that upon July 1 and 2, 1902, the defendants, whom he names (48 in number), conspiring together for that purpose, inflicted upon him certain injuries, the particulars of which are set forth as follows:

"That, in pursuance of a common design, purpose, and conspiracy agreed upon and formulated by said defendants, the said defendants, violently, forcibly, without warrant of law, with force and arms, and in direct violation of the criminal statutes of the state, assaulted, arrested, and detained your petitioner, marched him, by force and threats, into a lone forest, unfrequented by civilized

man, where he was by said defendants threatened, violently abused, ill treated, wronged, kicked, cuffed, and assaulted, by being struck on the head and body with a loaded pistol, and in other ways; and, finally, after being subjected to the most wicked and cruel outrages, the said defendants tied a rope around your petitioner's neck, threw one end thereof over the limb of a forest tree, and, by pulling thereon, petitioner was painfully drawn from the ground and suspended in the air, where he was allowed to remain until life was almost extinct before being released. That this hanging process was several times repeated and inflicted upon petitioner by defendants, in different places, and, when finally released, he was peremptorily ordered by said defendants to leave his family, his home, and business, and the state of Louisiana, and never to return, under penalty of immediate * * * death. Petitioner avers that all such wrongful, tortious, wicked, and outrageous acts of said defendants were done with a common purpose and intent, in pursuance of a common plan and idea, and in consequence of a conspiracy deliberately, wickedly, and feloniously entered into between all of said defendants, and that they are all bound in solido for the acts of each other, and for the damages caused by the acts of any one or all of the respective co-conspirators. Petitioner avers that, in consequence of the outrages and threats and the number of said defendant conspirators, he has been forced, through fear of his life, to abandon his business, his house, and his family, and to seek refuge in different parts of the state; that he is afraid either to return to his home and his family, or to let his present residence be known to said defendants. He avers that his business has been completely broken up by said defendants, that he has suffered great bodily pain and mental agony, and is entitled to reparation therefor."

He demands $3,000 for damage to his business, $5,000 for damage to his reputation, and $22,000 for physical and mental suffering.

Exceptions of "no cause of action" and "vagueness" were filed on behalf of all the defendants, and were overruled. The defendants Thomas Walker, William Anders, William Dillard, D. E. Gaar, William Radescich, E. M. Warren, Thomas Montgomery, Silas Wasson, H. Hall, J. T. Payne, and Alonzo Lee then filed a general denial. Joel Smith, J. W. Gaar, P. E. Grisham, A. Smith, Thomas Anders, George Anders, J. C. Smith, M. Dillard, T. L. Jones, C. R. Jones, W. M. Preston, W. H. Mann, Thomas Busby, Lee Busby, J. R. Sykes, P. F. Smith, William Terral, F. F. Walker, H. E. Walker, L. Anders, R. R. Gentry, Fox Deloney, John Deloney, and R. E. Hughes, by way of answer, after denying the allegations of the petition, save as admitted, allege, in substance, that about the 26th of June, 1902, a number of buildings in the town of Dodson were destroyed by a fire, which was generally believed to have been of incendiary origin, and that, as citizens of the town and neighborhood, they determined to make an investigation, and, with that end in view, convened in mass meeting. They aver that there was no intention to injure any one or to violate the law, and they specially deny that they did so. John Terral, B. H. Talbot, Z. T. Faith, Mike Gaar, B. M. Stovall, J. A. Dean, Jule Waters, J. R. Lee, and J. B. Milam amplify the defense as set up in the foregoing answers, as follows: "That the citizens of Dodson came together in mass meeting, and decided and resolved to investigate the origin of the fire and to get all the information that could be obtained for the purpose of prosecuting the guilty parties. That the defendants herein at once proceeded to investigate the matter and get up evidence, and in the course of the investigations were led to believe from the facts ascertained, and from the previous character and reputation of the plaintiff and of Ed. Warner

and Rube Brown, that they were the guilty parties, and that they were in a conspiracy to do the burning, and that they thought it best to interview those parties, separate and apart from each other, before they had time to concoct a scheme or tale for defense, and before they were arrested and put in jail together. That defendants proceeded to interview these plaintiffs separately and apart, and for that purpose they placed Rube Brown and Pete Warner under temporary restraint, and that Ed. Warner was not found, but came up afterwards, and was also put under temporary restraint. That these parties were all questioned, and that Pete Warner, in the presence of plaintiff, acknowledged that Rube Brown told him that he was going to burn the town, and that Rube Brown also told him, after the fire, that 'we got some of the damned old shacks.' This statement was repeated to Rube Brown in the presence of the other plaintiffs, and Rube Brown did not deny it, but simply said, 'Tell it all, Pete,' or words to that effect. Defendants deny that they inflicted any cruel treatment upon plaintiff, or that they swung him up to a limb, or that he was in any way hurt or injured, and aver that they had no intention to do him bodily harm, but that they were zealous and honest in their investigations, as law-abiding citizens, and that they acted, as the emergency demanded, to save the burning of the balance of the town, as they believed, and to ascertain the origin of the fire, and kept plaintiff in temporary restraint in the course of their investigations, believing, in good faith, that he and the other two parties were connected with the fire in a guilty way. That, when the investigation was over, defendants told the plaintiff and the other two parties that they would have to turn them over to the officers of the law, to which proposition Ed. Warner, the spokesman of the three, suggested, in the presence of Pete Warner and Rube Brown, that all three of them would leave the community rather than be put in jail, to which suggestion defendants assented, and they did leave the parish for a time. Defendants deny that plaintiff had a good reputation in the community before or after the fire, but allege that his reputation was not good, and defendants specially deny that plaintiff's character or reputation was injured by them."

It may be stated in this connection that separate suits for damages were filed by Ed. Warner and the plaintiff, and that the testimony taken seems to have been used indifferently in either case. This intimate relation between the two suits will perhaps explain some peculiarities in the language of the answer from which the foregoing excerpt is taken.

The case was tried before a jury, which brought in a verdict for plaintiff in the sum of $500, and, the same having been made the judgment of the court (save that the name of Thomas Anders, one of the defendants, has been omitted from such judgment), the plaintiff has appealed, and now prays that he be awarded a larger amount, whilst the defendants answer the appeal, and pray that plaintiff's demand be rejected or the case remanded.

During the trial the plaintiff consented to a nonsuit as to the damages alleged to have been sustained by reason of injury to his character, and the evidence adduced shows that the business in which he was engaged belonged to his brother, from whom he received one-half of the profits in lieu of wages.

A large number of witnesses were examined, and on some points there is conflict of testimony. The facts which we regard as indisputably established are as follows:

Ed., Morgan, and Pete Warner are brothers, and, at the date of the occurrences out of which this litigation arises, were about 28, 23, and 22 years old respectively. They are members of a large family, were born and reared in the parish of Winn, and have had few advantages in the way of education.

In November, 1901, Ed. Warner established himself in the livery stable business in the little village of Dodson, a place of, at most, a few hundred inhabitants, situated on the railroad some 10 or 12 miles distant from Winnfield, the parish seat of Winn parish. His stock in trade consisted of about ten horses and half a dozen vehicles, the whole worth, perhaps, $1,000; and he employed his brother Pete and one Jim Sherrod to assist him, his brother Morgan being employed in a sawmill in the neighborhood, and the three brothers, together with Rube Brown, a young man from the parish of Bienville, who was engaged, near Winnfield, in getting out cross-ties, living in a house presided over by the mother of the Warners, and which also sheltered their aunt and younger sister. On the evening of June 25, 1902, a fire supposed to have been of incendiary origin broke out in Dodson, and destroyed some 8 or 10 buildings, including that in which Warner kept his stable. Upon July 1st following, the grand jury was in session at Winnfield, and Pete Warner went there in obedience to a summons from that body. His brother Ed. was at that time driving a patron through the country, and did not return home until late in the afternoon; Morgan Warner was engaged in his usual work at the sawmill; Brown was engaged in his usual work; and Sherrod, as usual, was in charge of the stable. That being the situation, the defendants, with the exception of L. Anders, Wm. Anders, Wm. Dillard, H. Hall, A. Lee, W. H. Mann, Thomas Montgomery, Thomas Walker, E. M. Warren, and Silas Wasson, together with some other persons who have not been sued, assembled in Dodson, and, after consultation, subscribed to an instrument, in writing, as follows:

"We, the citizens of Dodson and the surrounding community, have reason to believe that our interest is endangered, and we, as a town, are any time liable to be destroyed by fire caused or started by an incendiary.

We therefore have met, and each of us whose signature appears below pledge ourselves to keep secret, as near as possible, all facts which might destroy the intention of said meeting. We further agree to stand together as a body of lawabiding citizens in protecting the interest of our town. We further agree, and do ask our citizens as undersigned, to take such steps as may be necessary to the investigation of the recent fire in the town. We each of us solemnly affirm that he will not talk to any one whose signature does [not] appear below."

When this instrument had been signed, or before, the chairman, by the authority of the meeting, appointed five committees, whose duty it was made to take charge of and interview the three Warners, Brown, and Sherrod, one committee being assigned to each of the five persons thus mentioned.

The committees so appointed acted promptly, and in accordance with the same general idea as to the function that they were to discharge. "Bill Terral, Redden Sykes, Bob Hughes, and Lee Busby" waited on Morgan Warner at the mill at which he was working, informed him that he was under arrest, remained with him, without permitting him to get out of their sight, until the whistle blew to stop work, refused to permit him to go home to change his clothing, carried or escorted him to Dodson, and kept him under guard until about 10 o'clock at night. Preston and one of the Terrals "arrested" Jim Sherrod at about 2 o'clock in the afternoon, and held him under guard until after sunset, going with him to the post office in order that he might mail a letter, and later, to the stable that he might feed the stock, but never losing sight of him. Talbot, Faith, Dean, Waters, Stovall, John Terral, and Mike Gaar boarded the train for Winnfield in search of Pete Warner, and also of Ed. Warner, whose whereabouts were unknown to them. They found Pete waiting to be called before the grand jury, but they informed him that they

wanted him to go with them to Dodson, and he consented to go, though, as he walked to the train, one of them walked on either side and held one of his arms. Stovall in the meanwhile bought a rope, which Terral afterwards carried in a closed umbrella. On the way back the plaintiff was guarded, without ostentation, but when the train reached a station some distance short of Dodson he was peremptorily ordered to get off, and, with the defendants holding his arms as before, he was marched in the direction of the woods, where he was informed, with a display of pistols and the use of harsh and abusive language, that he was to be hanged, and he was moved about in search of a tree that might answer the purpose of a gallows. When the tree was found, a pistol was brought to bear on him, his collar and necktie were torn off, a noose, which had been made at one end of the rope, was thrown around his neck, and, he says, the other end of the rope was thrown over the limb of the tree, and that he was drawn up in the air. The defendants deny that the rope was thrown over the limb of the tree, or that it was drawn uncomfortably tight on plaintiff's neck, and we will pass that question for the present. The plaintiff was then ordered to tell what he knew about the fire, and, upon his answering that he knew nothing, he was told that he lied, and that his captors would break his neck, shoot out his brains, etc., unless he told what he had said that he did not know. He was then led aside by the rope, which was still encircling his neck, for a private interview with one or two of the defendants, and, the interview not proving altogether satisfactory to them, the hanging demonstration was repeated. The defendants, at least the active participants in the mistreatment of the plaintiff, have testified that they had agreed that they would scare him by threatening to hang him or otherwise, but that it was not their intention to do him any serious injury. They, however, concur

in stating that their demonstrations were to be given such an appearance of reality as to convince the plaintiff that they were exactly what they appeared to be, and it is generally conceded that they produced that effect. Thus the witness Dean, referred to by the plaintiff, is interrogated, and answers as follows: "Q. That bluff was to be sufficiently strong and convincing to bring forth results, was it not? A. We just wanted him to tell what he knew. Q. You didn't expect to accomplish anything by playing with him? A. Without hurting him. Q. Repeat the question, Mr. Stenographer (which was done). A. We did not play with him."

The witness Talbot, also referred to by plaintiff, is interrogated, and answers as follows:

"Q. Did you give him time to pray—to meet his Maker? A. Yes, I told him that if he wanted to do anything of that sort he could do so. * * * Q. Well, you all were very much in earnest in what you were doing down there? A. We felt that way. Q. You didn't try to create the impression that it was a joke? A. No, sir. Q. You tried to make these boys believe that you were going to hang them if they didn't tell? A. Yes. * * * Q. What was the purpose, Doctor, in tying the ropes around the necks of these two boys? A. Why, it was to get them to tell what they knew about the fire. Q. Do you mean that it was to force them, through fear of being hung, to tell what they knew? A. Well, we didn't intend to hang them. Q. Doctor, I understood you to say, before, that you didn't intend to do that, but the question I now ask you [is], if your purpose, in tying the ropes around their necks, was not to compel them, through fear of being hung, to tell what they knew about the fire at Dodson? A. Why, of course that was it. * * * Q. Your manner and language toward these parties, when you held them under arrest, was very determined and very rough and very abusive, in order to make them believe

that you intended to do them some great harm if they did not confess to you what you desired or believed that they had knowledge of? A. I didn't say it was rough; of course, it was determined. Q. Was it violent—apparently, I mean? A. It might have appeared that way to them. * * * Q. Suppose one of the boys had resisted or drawn a weapon, would you have used yours? A. That is an opinion, now; I couldn't say. If I thought he intended to use his, I would have used mine. * * * (After an interval, and on redirect examination.) I would like to explain to the jury that had these parties attempted to liberate themselves, why I would not have felt justified in shooting one of them, but I meant to have said yesterday, as a matter of self-defense, that, had they attempted to use a weapon on me, I most certainly would have done the best I could on them."

After the second hanging demonstration, the plaintiff, who testifies that he did not desire any further experience of that kind, stated that Rube Brown had told him "that he was going to burn the town, and that he had burned a few of the damned old shacks," and, being confronted with Brown, who was also held by a rope, he or some one else informed Brown that the statement had been made, and the latter said, "Why don't you tell the whole story?" or something to that effect. Brown's case is not before us, nor is that of Ed. Warner, and we need say no more concerning them than that they were taken into the same woods as the plaintiff, and that they were all released, at 10 or 11 o'clock at night, with the distinct understanding that the plaintiff should leave Dodson early the next morning, that Brown should leave within three days, and that Ed. Warner should be allowed ten days within which to settle his business, at the expiration of which he also should leave. The plaintiff left the next morning very early, and without waiting for the train. But during the

day the defendants, or a number of them, had another meeting, to which Brown was invited, and as a result of which he left Dodson on the morning of July 3d, having passed the previous night in the custody of one of the defendants, who slept with his pistol by his side, and who, with another of the defendants, accompanied him to the depot and saw that he got off on the train, after buying his own ticket. It is said that the plaintiff left Dodson of his own accord, preferring that course to being turned over to the officers of the law, or to remaining in a town the citizens of which had such a poor opinion of him. We do not find this to be a fact. Our conclusion is, the testimony of the defendants to the contrary notwithstanding, that he was given to understand that his immediate departure and absence from Dodson were essential to his continued existence, and we are inclined to think that the suggestion contained no idle threat.

Returning to the pretermitted question: Was the plaintiff actually suspended by the neck? There is this, among other things, to be said: The plaintiff is the only witness in his own behalf who was present, and he testifies, positively and circumstantially, that he was so suspended, and that, on the occasion of his second suspension (to quote his language), "When they let me down, I fell up against Morgan Stovall—I suppose I did, as I was there when I knew where I was at."

Several of the defendants who were present testify that the rope was only 5 or 6 feet long, that the limb of the tree was 10 feet above the ground, and that the end of the rope was not, and could not have been, thrown over the limb. It is conceded, however, that on both occasions one of the defendants climbed the tree in order to impress the plaintiff with the idea that his purpose was to throw the rope over the limb, and the question suggests itself, how could the defendants have expected to impress the plaintiff with the belief that a rope only 5 or 6

feet long, after having been looped around his neck, could be passed over the limb of a tree, 10 feet high, and fall down upon the other side far enough to enable them to reach it and thereby lift him off the ground? Beyond this, Dean, a defendant who was on the spot, and who was a member of the committee specially charged with the extraction of information from the plaintiff, testifies that the rope was thrown over the limb, and that he caught it, within a foot or two of the plaintiff's neck, in order to prevent its being tightened from the other side. It is true that the court took a recess about that time, and after the recess the witness corrected his testimony and stated that the rope was not thrown over the limb, but it is also true that he testified after the recess that he had had no particular conversation with any one during the recess, whereas it was proved conclusively, and without attempt at contradiction, that two of the defendants, who had testified that the rope was too short to go over the limb, had talked to him for some time during the recess with great animation.

Again, Felix Walker, Jr., a witness for the plaintiff, referring to one of the defendants, gives the following testimony, which there has been no attempt to contradict, to wit: "I walked up, and Cyrus Jones turned around and went to talking to me about it, and he told me that Ed. was the biggest coward in the bunch; that he jerked the rope off his neck. I spoke up and said, 'Did you hang him up?' and he says, 'Yes, we hung the s——s of b——s up.' "

Our conclusion, then, is that the plaintiff's allegations as to the circumstances and manner of his treatment are substantially established by the evidence in the record.

### Opinion.

On the trial, the defendants offered to prove the facts which led them to suspect that plaintiff had some guilty connection with the fire which had occurred in Dodson on June 25, 1902, and several bills of exception were taken to the ruling of the trial judge in excluding the evidence so offered. The ruling complained of was manifestly correct. Torture is no longer permitted in civilized countries, even as a punishment for crime, and still less can it be tolerated upon the bare suspicion that a crime has been committed, or to extort a confession thereof or an accusation against others. The plaintiff claims only actual damages, and, if the defendants had been allowed to prove their suspicions of his complicity in the fire, such evidence would have been entitled to no weight by way of mitigation, for, even under the authorities which hold that provocation may be shown in mitigation of exemplary damages, the provocation must be immediate, whereas the alleged provocation in this case had occurred five days before the infliction of the injury. In the well-considered case of Goldsmith v. Joy (Vt.) 17 Atl. 1010, 4 L. R. A. 500, 15 Am. St. Rep. 923, in which the American and English cases upon the subject are reviewed, the Supreme Court of Vermont say:

"It is a general and wholesome rule of law that whenever, by an act which he could have avoided and which cannot be justified in law, a person inflicts an immediate injury by force, he is legally answerable in damages to the party injured. * * * If provocative words may mitigate, it follows that they may reduce the damages to a mere nominal sum, and thus practically justify an assault and battery. But why, under this rule, may they not fully justify? If in one case the provocation is so great that the jury may award only nominal damages, why, in another in which the provocation is far greater, should they not be permitted to acquit the defendant, and thus overturn the well-settled law that words cannot justify an assault? On the other hand, if words cannot justify, they should not mitigate."

For the reasons stated above, it is unnecessary to decide whether an immediate provo-

cation can be shown by way of mitigation, since the defendants in this case had no immediate provocation and acted with entire deliberation. Other bills were taken on behalf of the defendants; one to the judge's charge as given, and fourteen to his refusal to give special charges. It is evident, however, that in a civil case, where there is no well-founded complaint of the exclusion of evidence, it becomes immaterial, on the appeal, whether the charge of the trial judge was right or wrong, since it is the duty and the privilege of this court to apply the law according to its understanding thereof, and regardless of what the trial judge may have charged.

Two bills of exception were also taken on behalf of plaintiff, but they are not insisted on, and need not be considered.

The fire in Dodson occurred on June 25th. On July 1st, when the defendants took the plaintiff into their custody, the grand jury was in session at Winnfield, about 12 miles away. The foreman was a prominent citizen of Dodson, and the plaintiff was in attendance, in response to a summons, as a witness. In all probability, therefore, the body charged by law with that function was then investigating the origin of the fire, and the defendants, instead of laying their facts, if they had any, and their suspicions, before that body, removed the witness who had been summoned to appear before it, and undertook to conduct the investigation, not only outside of the law, but in a manner which reduced the community of which they profess to be the representatives to the level of a lawless and ignorant horde of savages. Whilst, therefore, their professions are those of lawabiding citizens, their conduct was that of anarchists, recognizing no governing power save unbridled passion. The plaintiff in this case is a mere boy, who, though the door was opened for the proof, is not shown ever to have been convicted of any offense, or ever to have been charged with any, save

the shooting of an ox, the value of which he paid to the owner, and thereafter recovered in a civil action in which he satisfied the court that he was not guilty of the charge. In the matter of the fire at Dodson, the grand jury, which was in session in July, 1902, brought in no bill against him. The trial of the instant case began on February 5, 1903, and lasted until February 14th, when the jury brought in the verdict. On the 12th of February, during the trial, the grand jury, then in session, found an indictment against the two Warners and Rube Brown, charging them with arson with respect to the fire in question, and the indictment was admitted in evidence, over the objection of plaintiff's counsel, who thereupon offered to prove that a large proportion of the members of the body by whom it had been found were closely related to the defendants in whose behalf it was offered. The evidence was objected to and excluded, and no action by this court in the matter is now invoked. It is, however, stated by counsel for the plaintiff in his brief, and is not denied by the other side, that the prosecution under the indictment so found was promptly abandoned.

The jury by which the case was tried found "against the defendants, in favor of the plaintiff, for conspiracy, mental anguish, terror, and distress, in the sum of $500," and, whilst we appreciate their action in thus stamping with disapproval the lawlessness of which the defendants have been guilty, we are of opinion that the amount awarded falls short of compensating the plaintiff. To the mental anguish, terror, and distress which he suffered whilst the defendants held him in custody, there is to be added some physical suffering, beyond which there is also to be added the sense of humiliation and disgrace with which he must ever in the future remember that, with a rope around his neck or fastened upon his arm, he was for hours led about, rather like

a dog than even a criminal, with occasional demonstrations of hanging, or actual hanging, as suited the humor of his captors. No amount of money could fully compensate a self-respecting man for such treatment, but five thousand dollars will perhaps come nearer doing so than five hundred, and we shall therefore fix the plaintiff's damages at that amount. There is, we think, error in the verdict and judgment appealed from in another respect. Thos. Walker, Wm. Anders, William Dillard, E. M. Warren, Thos. Montgomery, Silas Wasson, H. Hall, J. T. Payne, and Alonzo Lee have filed a general denial. It does not appear that they signed the instrument of July 1st (copied in the statement which precedes this opinion), nor is there any evidence in the record which connects them with the unlawful acts of which the plaintiff complains. A. B. Anders, Jim Terral, and Lee Terral filed no answer at all, and are connected with the matter only by reason of the fact that their signatures are attached to the instrument mentioned. That instrument is, of itself, harmless, and the evidence dehors the instrument leads us to believe that there were some of the signers who really did not contemplate that anything unlawful would be done, or, rather, it fails to show, as to all the signers, that they had such action in contemplation. And this is true as to the three whose names are last above mentioned. It is also true of D. E. Gaar and William Radescich, who joined in the general denial, and of Joel Smith, J. W. Gaar, John Gaar, P. E. Grisham, A. Smith, Thomas Anderson (against whom no judgment has been rendered), George Anders, I. C. Smith, M. Dillard, T. L. Jones, Thomas Busby, Lee Busby, P. F. Smith, F. T. Walker, H. E. Walker, Fox Deloney, and John Deloney, who, in the answer filed by them, admit that they met together and resolved to investigate the fire, but deny that they had any unlawful purpose in view, and as

112 LA.—27

against whom we find no other evidence than their signatures affixed to the instrument mentioned. W. H. Mann and L. Anders make the same defense and are in the same position, save that their signatures do not so appear. Upon the other hand, C. R. Jones, W. M. Preston, J. R. Sykes, William Terral, R. R. Gentry, and R. E. Hughes, who also joined in the answer filed by the defendants last mentioned, not only signed the agreement of July 1st, but are shown to have actually participated in executing it in an unlawful manner.

As to the remaining defendants, i. e., John Terral, R. H. Talbot, Z. T. Faith, Mike Gaar, B. M. Stovall, J. A. Dean, Jule Waters, J. R. Lee, and J. B. Milam, they not only signed the agreement, but, with the exception of Lee, were the persons who took the plaintiff in charge and inflicted upon him the injury of which he complains, beyond which they admit, in the answer filed by them, that they subjected the plaintiff to the unlawful restraint during which he received that injury, and they must be held liable for the consequences.

It is therefore ordered, adjudged, and decreed that, in so far as it condemns A. B. Anders, George Anders, L. Anders, Thomas Anders, Lee Busby, Thomas Busby, Fox Deloney, John Deloney, M. Dillard, W. Dillard, D. E. Gaar, John Gaar, J. W. Gaar, P. E. Grisham, H. Hall, T. L. Jones, A. Lee, W. H. Mann, Thomas Montgomery, J. T. Payne, William Radescich, A. Smith, I. C. Smith, Joel Smith, P. F. Smith, Jim Terral, Lee Terral, F. T. Walker, Thomas Walker, H. E. Walker, E. M. Warren, and Silas Wasson, the judgment appealed from be annulled, avoided, and reversed, and that the demand of the plaintiff be rejected at his cost. It is further ordered, adjudged, and decreed that, as to J. A. Dean, Z. T. Faith, Mike Gaar, R. R. Gentry, R. E. Hughes, C. R. Jones, J. R. Lee, J. B. Milam, W. M. Preston, J. R. Sykes,

B. M. Stovall, B. H. Talbot, John Terral, Wm. Terral, and Jule Waters, said judgment be amended by increasing the amount thereof from $500 to $5,000, and, as amended, affirmed, said defendants last mentioned to pay all costs, save such as may have been incurred by their codefendants who are discharged by this judgment, which costs shall be paid by the plaintiff.

BREAUX, J., concurs in the decree.

### On Application for Rehearing.

#### (Feb. 1, 1904.)

BREAUX, J. Plaintiff and appellant, in his petition for a rehearing, sets up that we overlooked portions of the evidence, and thereby held as not bound a number of the defendants who are equally as liable as those against whom a judgment has heretofore been rendered.

In order to set this matter at rest, we have to determine, contradictorily with the defendants not heretofore condemned, whether there is anything in the averment.

The parties sued are John Terral, B. H. Talbot, Z. T. Faith, Joel Smith, Thomas Walker, J. W. Gaar, Mike Gaar, John Gaar, P. E. Grisham, A. Smith, William Anders, Thomas Anders, A. B. Anders, George Anders, I. C. Smith, March Dillard, William Dillard, B. M. Stovall, T. L. Jones, C. R. Jones, W. M. Preston, W. H. Mann, Thos. Busby, Lee Busby, J. R. Sykes, P. F. Smith, D. E. Gaar, J. A. Dean, Wm. Terral, Lee Terral, Jim Terral, F. T. Walker, H. E. Walker, L. Anders, Jules Waters, R. R. Gentry, Fox Deloney, John Deloney, William Radescich, J. R. Lee, E. M. Warren, Thomas Montgomery, R. E. Hughes, Silas Wasson, H. Hall, J. B. Milam, J. T. Payne, and Alonzo Lee.

Our decree was rendered against J. A. Dean, Z. T. Faith, Mike Gaar, R. Gentry, R. E. Hughes, C. R. Jones, J. R. Lee, J. B. Milam, W. M. Preston, J. R. Sykes, B. M. Stovall, B. H. Talbot, John Terral, Wm. Terral, and Jules Waters.

The contention is, in the application for a rehearing, that the following named persons are also liable: A. B. Anders (Adam Anders), Jim Terral, Lee Terral, George Anders, J. W. Gaar, I. C. Smith (J. C. Smith), Thomas Busby, P. F. Smith, Fox Deloney, W. H. Mann, William Dillard, named, as plaintiff has it, in one group.

The others named in the application for a rehearing are: A. Smith, F. T. Walker, Thomas Anders, Lee Busby, John Deloney, M. Dillard, John Gaar, P. E. Grisham, T. L. Jones, Wm. Radescich, Joel Smith, Jim Terral, H. E. Walker.

A new trial is granted as to the parties named in the application for a rehearing, as parties against whom judgment (as contended by plaintiff) should also be rendered.

We limit the application to these persons named in the petition not included in our decree. None others are included; that is, those names commencing with A. B. Anders as head of the list, including the first and second list, and concluding with the name of H. E. Walker, and such other names as are set forth in plaintiff's petition but not included in our decree.

The only question at issue is whether these parties are or are not equally liable as the parties condemned by us in our original decision.

All other issues have been decided, and the court refuses to grant a rehearing as to them, and further, in this connection, the court refuses to grant a rehearing to defendants (heretofore condemned) on their application for rehearing. As to these defendants the rehearing is refused.

(Rehearing is granted as to the one point particularly mentioned above; that is, whether other defendants are bound than those against whom judgment has heretofore been rendered.)

On Rehearing.

(June 21, 1904.)

MONROE, J. Counsel for plaintiff say in their brief that A. B. Anders joined in the answer admitting that defendants "met together and resolved 'to investigate the fire," and they refer the court to page 4 of the transcript in verification of that statement. We find on page 4 an exception of no cause of action, etc. Turning to the answer mentioned, which is on page 6, we do not find the name of A. B. Anders as a party thereto. So far as the record in this court shows, therefore, no answer was filed by, no default was taken against, and no issue was joined as to, A. B. Anders. The counsel say that Jim Terral and Lee Terral filed no answers, but permitted the case "to go by default against them," and they refer the court to page 21 of the transcript. There is nothing on page 21, or elsewhere in the transcript, so far as we are able to discover, to show that any default was entered against, or issue joined as to, the two defendants mentioned.

Counsel say that J. W. Gaar actually participated in executing unlawfully the agreement of July 1st, and they refer to his testimony, on pages 503 to 524, in verification of the statement. It has since been admitted that the testimony thus referred to is that of Mike Gaar, and he swears (page 521) that J. W. Gaar was not present at the mishandling of the plaintiff.

It is said that A. S. Smith, F. T. Walker, Thomas Anders, Lee Busby, John Deloney, M. Dillard, John Gaar, P. E. Grisham, T. L. Jones, William Radescich, Joel Smith, and H. E. Walker participated in the first meeting, signed the agreement, participated in the second meeting, and answered as has been stated in the original opinion, and that those acts are sufficient to make them liable, as conspirators, for the injury inflicted on the plaintiff. We, however, find no reason for changing the view, already expressed, that,

inasmuch as the action of the meeting and the meaning of the agreement of July 1st were differently understood by different persons, the liability of the participants to the plaintiff must depend upon the interpretation placed by them respectively upon such action and agreement. The defendants whose names have been mentioned, speaking for themselves, in their answer aver "that there was no intention to injure any one, and no purpose or plan to violate the law," and, so far as they are concerned, the contrary has not been shown.

A re-examination of the record has led to the conclusion that George Anders, I. C. Smith, Thos. Busby, P. F. Smith, Fox Deloney, W. H. Mann, and William Dillard have been shown to have actively participated in executing unlawfully the will of the meeting and the written agreement above mentioned.

It is therefore ordered, adjudged, and decreed that the judgment heretofore handed down be amended by adding to the list of defendants who are condemned, in solido, the names of George Anders, I. C. Smith, Thomas Busby, P. F. Smith, Fox Deloney, W. H. Mann, and William Dillard, and, as thus amended, that said judgment be now reinstated and made the final judgment in the case.